John Eschman, Appellee, v. Adam Huebner and Joseph Proebstle, Appellants.

Gen. No. 27,164.

1. CONSPIRACY—*evidence of malicious expulsion of member from labor union by officers.* In an action against national officers of a labor union for damages to plaintiff's good name and reputation as a member of a local union, as the result of conspiracy to deprive plaintiff of his union card and of employment, a verdict for plaintiff is sustained by the evidence where it shows that because of personal feeling against plaintiff one of the defendants threatened to plaintiff "to get your job and your card," that thereafter charges were preferred by defendants against plaintiff on fictitious grounds, that as the result of refusal of plaintiff's local union to try' him on charges preferred by defendants the charter of such local union was revoked by defendants and other national officers acting together, and on the reorganization of such local union reinstatement of plaintiff as a member thereof was refused and his card forfeited, that the charges in question were without foundation and fabricated, that as a result thereof plaintiff was discharged from his employment.

2. TRADE UNIONS—*right to discipline member does not include right to expel without cause.* The right of a trade union to enforce its constitution, by-laws, rules and regulations by disciplining its members and, if necessary, by expulsion does not relieve the officers of such union from liability for damages where, in revenge upon a member who has opposed them by legitimate means, they maliciously trumped up charges against him, forced his local union to oust him and thus caused his discharge from employment under circumstances making his re-employment in his occupation impossible.

3. CONSPIRACY—*when concerted action not essential element.* In an action by a member of a trade union against certain officers thereof for damages for maliciously injuring his good name and reputation in business by causing him to lose his employment, the fact that the evidence may not justify an inference of concerted action by defendants does not defeat the action although conspiracy is charged, where the evidence shows that each of the defendants went out to "get" the complainant and to deprive him of employment and that they accomplished their ends, the gist of the action being the tort committed and the resultant damage.

Appeal from the Circuit Court of Cook county; the Hon. DONALD L. MORRILL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1921. Affirmed. Opinion filed November 29, 1922.

McMAHON, GRABER & ELWARD, for appellants; NASH & AHERN, of counsel.

ERNEST C. RENIFF, for appellee.

MR. PRESIDING JUSTICE THOMSON delivered the opinion of the court.

By this appeal the defendants seek to reverse a judgment for $1,800, recovered against them by the plaintiff in the circuit court of Cook county. The issues were submitted to a jury and the finding was for the plaintiff and the damages were assessed at the amount named. The declaration filed by the plaintiff consisted of a number of counts, all charging in effect that the plaintiff was a brewer and malster and a member in good standing of Local 18 of the International Union of the United Brewery Workmen of America; that a contract existed between the union and the brewers, whereby no person was or could be employed as a brewer and malster who was not a member of the union, in good standing; that the plaintiff had been employed for many years by one of the breweries in Chicago as a brewer and malster and that he had always conducted himself in an efficient and competent manner, and was esteemed by his employers; that the defendants conspired wickedly, maliciously, and wrongfully to injure him and to destroy his good name and reputation in his business, and to cause him to be discharged from his employment and make it impossible for him thereafter to get employment as a brewer and malster, and that they agreed and conspired together to cause him to lose his membership in the union, and did cause him to lose said membership, and that by reason thereof he was discharged

from his employment as a brewer and malster, and thereafter, by reason of the acts of the defendants, he had been unable to procure employment as a brewer and malster, to his material damage. Issue was joined by a plea of the general issue duly filed by the defendants. Demurrers were filed to certain counts, and, subsequently, additional counts were filed, but the questions raised on this appeal do not involve those proceedings.

It appears from the evidence that the national convention of the International Union was held at Denver in September, 1912. Huebner and Proebstle were international secretaries of the union, and were re-elected as such at that convention. Eschman was one of three delegates to the convention from Local 18. One Berger, a witness for the defendants, was another of those three delegates. At the convention, Eschman made an effort to bring about the nomination and election of a candidate in opposition to Huebner, but in this he was not successful. Eschman testified that this activity on his part made Huebner angry and that Huebner told him in Denver that he would "get him." He further testified that after he returned to Chicago, he made a report to Local 18, at one of its regular meetings, at which Huebner was present; that Huebner got up in this meeting and asked those present why they had disgraced their local by sending as one of their delegates a man who was in a drunken condition and "make a monkey of himself," whereupon, many of those present protested against Huebner's language, and the latter then said that he could get no justice there, and he left the meeting, remarking to the plaintiff as he did so, "I'll get your job and your card now." Eschman testified that he had said nothing to reflect on Huebner but had merely opposed his re-election as an international secretary. This meeting was early in the fall of 1912. Eschman testified that in November Huebner preferred charges against him in

Local 18, contending that he had slandered him (Huebner), the slander consisting of a circular which had been sent out by Local 18, referring to a· trip Huebner had made to Europe on union funds, with which circular Eschman said he had nothing to do. He further testified that the local union did nothing about this at the time, and in December Huebner came from headquarters of the International Union at Cincinnati with a committee of five, including Proebstle, and appeared at one of the meetings of the local union and demanded that the plaintiff, together with one Herman, be tried by the local union on the charges referred to; that the local union refused to comply with their demand, whereupon, Huebner advised them that if the demand was not complied with he would revoke their charter; that in January this same committee called a special session of the executive board of the local union and at this meeting the two defendants, with others, "demanded a conviction" whereupon the plaintiff was expelled from the union, and was notified that he had thirty days to appeal to the International Executive Board; that he filed his appeal in writing with that board in Cincinnati, which appeal was rejected, and that about two weeks later he was reinstated by the local union. He further testified that some time later the charter of the local union was revoked and the union was reorganized; that he did not apply for membership in the new organization, —"I didn't get in; they got their applications by mail and they didn't mail any to me. * * * I tried to get in but I couldn't"; that they would not give him a union card, and on April 21, 1913, he was discharged by his employer, The Atlas Brewing Company.

The plaintiff testified that some time later he met Huebner on the street in Chicago, and on that occasion he said to Huebner: "You got my job and my card. You notified the Atlas Brewing Company that I had no card and I was discharged," in reply to which

Huebner said: "I told you I would get you, and you will never get in any more." That on another occasion he met Proebstle on the street, whereupon, he said to Proebstle: "I see you got my card, you got me out of work," and the latter replied: "That's the way to fix fellows like you. We put them on the bum and as long as Huebner and I are in there, you will never get in. We will put a stop to your fighting us."

On cross-examination, the plaintiff denied that he made charges against any of the officers of the International Union at the time he submitted his report to his local union; that he had nothing to do with the preparation of the circular referred to, which had been signed and sent but by three members of the local union whose names were Burghardt, Muth and Schreiber. This circular was later introduced in evidence. It contained the signatures of the three men above named and also three other names, one being the plaintiff's, but the latter testified that it was not his signature.

Several members of Local 18 and the brewmaster of the Atlas Brewing Company testified for the plaintiff and their testimony corroborated that of the plaintiff.

Proebstle testified that in October the circular above referred to was received at International Headquarters from the secretary of the local union, apparently for publication in the Brewery Worker's Journal. Under date of November 8, Huebner as International secretary and treasurer, wrote the secretary of Local 18, saying that the circular had been placed before their executive board and it had been decided not to publish it and a demand was made on the local union that Burghardt, Muth and Schreiber, whose names were signed to the circular, produce proof of their accusations. In this letter, charges of slander were preferred against the three members named, and Local 18 was directed to give them a trial. The original circular in evidence shows the names of

these three members, signed in ink. Below these
names appears the name of the plaintiff, in blue pen-
cil, and below that appear the names of two others,
written in black pencil, the latter being the names of
Albert Grelk and Joseph Herman. Proebstle testified
that under date of December 6, 1912, a communica-
tion was sent from the secretary of the International
Union to the secretary of the local union, telling him
that at the last meeting of the International Executive
Board Huebner had advised the board that he had pre-
ferred charges before the local union against these six
men, for slandering officials of the International, and
that the local union had refused to proceed against
them. By this communication, the International
Board demanded that the local union take up these
charges and that the six men named be required to
prove their statements, and that in case they did not
do so, they were "to take the consequences, as per the
constitution." Proebstle further testified that under
date of January 6, 1913, Huebner, as International
secretary, sent a letter to the secretary of the local
union, reading in part as follows: "Inasmuch as my
last charges of November 8th, preferred against Max
Burghardt, Jos. Muth and Chas. Schreiber, have not
as yet been taken into consideration by your honorable
body, I am compelled again to bring these charges to
your attention, with the supplement that I also pre-
fer charges against Jos. Herman, John Eschman and
Albert Grelk, according to article 3, paragraph 4 of
the International constitution, for slandering."
Proebstle further testified that he attended a meeting
of the local union in January, having been instructed
by the executive board to see that Eschman proved his
charges against the International officers, "so that we
could try the International officers accused   *   *   *
and if he could not prove them, he would then have to
be tried"; that at this meeting the plaintiff said that
Huebner was a crook and a swindler and that, as sec-

Eschman v. Huebner et al., 226 Ill. App. 537.

retary and treasurer, he had misappropriated the funds of the organization. The witness denied that either he or Huebner stated at that meeting that unless Eschman was put out of the union its charter would be revoked; but that he stated that if Eschman could prove his charges, there would be no room in their organization for such a secretary and treasurer, but that if the charges made by Eschman and others could not be proven, "they must stand trial as per the constitution." He further testified that at the prior meeting, the local union having refused to try Eschman, "we cited the constitution and said that if they didn't carry out the provisions of the International constitution and try to find out the truth, their charter would be revoked." He further testified that "after Local Union 18 had defied all laws, and after we had offered to send an independent committee to be selected from five different cities, and not connected with the National Executive Board, to come here and listen to the allegations that the secretary and treasurer was a crook, after they refused that offer, we revoked the charter." Proebstle testified that he appeared before the executive board of the local union to see that they gave Eschman a trial, "and also Huebner a trial." He then testified about the action of the executive board of the local union in expelling Eschman, of the latter's appeal to the International Executive Board, and its rejection, and that the next thing he heard about the matter was that the local union had reinstated Eschman; that this was contrary to any authority in the constitution or by-laws of the union; that the International Board then appointed a committee to "remove the charter of Local Union No. 18 and reorganize the local union." Proebstle denied ever having met Eschman on the street after the latter had been expelled and discharged by his employer, or having the conversation with him to which the latter testified.

On cross-examination Proebstle testified that the charges against Eschman were not based on the statements contained in the circular referred to, but "upon his slanderous remarks in the meeting, and in public, that the International officers were crooks." He was asked whether he submitted any testimony to the local union with reference to the charges against Eschman at the meeting on January 19, 1913, and he replied: "There were no charges against Eschman at that time."

Huebner testified that he had been designated by the International Board to adjust some matters in Local 18, so he arranged to attend the meeting in September after the Denver convention, and while in Denver he told Eschman that he would be at that meeting and would hear his report; that when he was called on for a report at that meeting "he said he had no report to make, that it was a steam roller, that nobody can get these crooks out of office"; that he (Huebner) then asked for the floor and proceeded to remind the members present that their union was one of the oldest unions in the organization and that it was a disgrace to send a man like Eschman to the convention; that he was not sober at any time in Denver and that in the future they should send someone who could represent them in an honorable way; that Eschman said the witness was a crook and that he showed the white feather and so on; that the witness then left the meeting while all the members were "yapping"; that as he went out Eschman said: "We got him, he shows the white feather, there goes the crook"; that on his return to Cincinnati the witness informed the International Board of the conditions in Chicago and demanded that Eschman be required to prove his charges and that either he or the witness be expelled; that later the circular, above referred to, was sent down to Cincinnati; that in November he came to Chicago to present the charges of slander against Burg-

hardt, Muth and Schreiber; that at a meeting of the local union, held at that time, Eschman repeated the remarks he had made at the September meeting and alleged that the statements made in the circular were true; that Herman and Grelk made similar statements; that he returned to Cincinnati and reported these facts to the International Board, which then directed him to prefer charges against all six men, which he did, but the local union refused to hear them; that a meeting of the International Board was held early in January, and it was then ordered that an investigation be made, and if the charges against the International officers were not proven, that action must be taken against Eschman and others, and that if they were proven, the International officers involved should be expelled; that the committee of five was then appointed, including the defendants, and they came to Chicago and informed the local union of the action of the executive board, at a meeting of the local union held January 19, and at that time Eschman repeated his alleged slanderous statements. He testified about the action taken by the local union at that meeting, about a so-called referendum vote on January 23, and a hearing held by the local executive board on January 26, which Eschman refused to attend; that at that hearing the witness offered evidence as to the remarks Eschman had made at the various meetings of the local union. Huebner further testified about the expulsion of Eschman on January 26, his appeal to the International Board, and its rejection, and later the reinstatement of Eschman by the local union, and he then stated that the International Board revoked the charter of the local union, because they had not carried out its instructions, whereupon, a committee of three, consisting of Huebner and two others, was sent to Chicago to reorganize the local union; that the members who had been suspended or expelled were given an opportunity to join the new local union on

condition that they retract the statements which had
been the basis of their suspension or expulsion; that
all such members, except Eschman, made the required
retraction and filed application for membership in the
new local; that Eschman made application for rein-
statement but did not sign a retraction. This witness
denied making any of the statements to Eschman
which the latter testified to.

On cross-examination, Huebner testified that when
the written circular was sent down to Cincinnati for
publication, it bore only the signatures of Burghardt,
Muth and Schreiber, and that the other three names
appearing on the circular, as it was introduced in evi-
dence, namely, those of Eschman, Grelk and Herman,
were placed on the circular by the witness after they
had stated that the charges contained in the circular
were true. The witness denied he had requested the
brewmaster not to give Eschman employment, or that
he had told the local board that they could either ex-
pel Eschman or he would take their charter away.

Two members of Local 18 and a member of the
International Executive Board testified in support of
the defendants.

From this evidence it is apparent that two distinct
theories were presented to the jury and it was for
them to decide which was the true one. It was the
plaintiff's contention that solely because of his oppo-
sition interposed at the Denver convention, the de-
fendants, in a spirit of revenge, proceeded to "get
him,"—to oust him from the union and thus make it
impossible for him to continue in his vocation; that
they did accomplish that result and then boasted that
they had "put a stop to your fighting us." It was the
defendants' contention that their course had been
prompted solely by the fact that the plaintiff openly
charged them with being crooks and thieves; that they
alleged this to be a slander on them and therefore pre-
ferred charges against him in the regular way, and

that on a hearing of those charges his local union expelled him and later reinstated him. It was not denied that the defendants had told the executive board of the local union that their charter would be revoked unless they took certain action. It was the plaintiff's contention that this threat was made to force the local union to put him out while it was the contention of the defendants that it was made to compel the local union to proceed to hear the charges against the plaintiff in the regular way. On all the facts presented to the jury by the testimony, they found that the theory of the plaintiff was the true one, and we are of the opinion that the evidence is such that this court would not be warranted in holding that their verdict is against the manifest weight of the evidence. In this connection it is a significant circumstance that, although this was the second trial of this case, it was the position of the defendants, up to as late a point in this trial as the cross-examination of the plaintiff, that he had signed the circular which has been referred to, and was thus a party to its being put forth. On his cross-examination, counsel for the defendants attempted to make the plaintiff admit that his name, as it appeared on the circular, was his signature, but he denied it. This position of the plaintiff was supported by the secretary of the local union, who testified that he sent the circular down to Cincinnati, and when he did so, plaintiff's signature did not appear on it. On his cross-examination, the defendant Huebner admitted that he had put plaintiff's name on the circular after the latter had alleged that the statements it contained were true, and that he also put the names of Grelk and Herman on the circular after they had made similar statements. Huebner first preferred charges against the three members of the union who admittedly signed the circular and then added charges against the other three, but on the trial he finally took the position that the charges preferred against the plaintiff were not

based on the statements contained in the circular but on what it was claimed the plaintiff had said about the defendants, verbally, at the various meetings of the local union.

In support of this appeal the defendants contend that this case clearly comes within the principle that a voluntary association, such as the union involved here, has the right, in self-protection, to discipline its own members according to its constitution and laws, and, if no provision is made in such constitution and laws, according to the common law, citing *Moon v. Flack*, 74 N. H. 140, 65 Atl. 829; *Grand Lodge v. Schuetze*, 36 Tex. Civ. App. 539, 83 S. W. 241; *Kemp v. Division No. 241*, 255 Ill. 213; *Graham v. Knott*, 14 B. C. 107; and *Engel v. Walsh*, 258 Ill. 98. In reply the plaintiff concedes the principle invoked but contends that this case does not come within it as the defendants contend. In our opinion that contention of the plaintiff is correct in view of the evidence and the verdict of the jury upon it. While a voluntary association like a labor union may discipline its members as provided by its constitution and rules, officials of such an association or union are liable in damages, if, in revenge against a member who opposes them, they maliciously proceed to trump up charges against him and force his local to oust him, and thus cause him to lose his employment and bring about his discharge by an employer who has no complaint against him.

In the case of *Moon v. Flack, supra,* the plaintiff proceeded against the defendants on the theory that they had conspired to unlawfully expel him from a lodge of Odd Fellows and alleged that they had preferred charges against him, "without having probable cause to believe he was guilty." The court held that even though the defendants may have conspired to bring about the plaintiff's expulsion from the lodge, they were not liable in damages "since they had prob-

able cause to believe he was guilty,'' and in that situation it did not matter how bitter and hostile the defendants' personal feelings were against the plaintiff, or how persistent they were in conspiring to bring about his expulsion.

On the facts involved in the case of *Grand Lodge v. Schuetze, supra,* it was held that there was nothing in the acts of the officials of the lodge which were complained of to indicate that they were done for the purpose of injuring the plaintiff but that their conduct, as disclosed by the evidence, negatived the existence of any desire on their part to injure her.

The case at bar is not one against an organization, based on such premises, but is one against certain individuals, charging that they committed the acts complained of, without any proper grounds, and with a malicious intent to injure the plaintiff. Counsel for the defendants repeatedly assert, in their brief, that there is no evidence in the record of any malice on the part of the defendants. The bare recitation of the testimony, as above set forth, demonstrates the contrary. If the testimony of the plaintiff and his witnesses is true, there was not the slightest foundation for the charges preferred by the defendants, but they went after the plaintiff to ''get him'' with a malicious intent to oust him, because of his opposition to them, to his material damage. Of course, the evidence on that issue, as it is found in the record, is in sharp conflict. But the jury passed upon it and found against the contentions of the defendants, and, as already stated, we cannot hold that such finding is against the manifest weight of the evidence.

The case of *Kemp v. Division No. 241, supra,* involved no such issues as are involved here. There the court merely stated that the members of a union, who had refused to abide certain action of the union and had withdrawn from it, would have no right of action at law against the union or its officials, if the latter

threatened to call a strike against an employer by which all the parties were employed, unless such former members were discharged by the employer, as a result of which they were so discharged.

In the case of *Graham v. Knott, supra,* the court said: "In all cases then, the question for the court or jury is whether, having regard to all the circumstances, the object of the union was merely to exercise their right of settling for themselves with whom they should be associated in their work, or whether their object was to persecute the individual and, if possible, deprive him of his equal rights to make his living by the common trade." In that case the plaintiff had refused to take a certain test of workmanship required by the rules of the union on the ground that it was unfair. The union notified his employer that the other workmen would be called out if he was retained and the plaintiff was discharged. The court held that under all the circumstances disclosed by the evidence the case fell within the class first referred to in the language above quoted, and therefore the plaintiff could not recover.

The case of *Engel v. Walsh, supra,* merely sets out the general principle invoked by the defendants, with which the plaintiff takes no exception, but involves no such issues of fact as are presented in the case at bar.

The case of *Brennan v. United Hatters of North America, Local No. 17,* 73 N. J. L. 729, 65 Atl. 165, did involve issues similar to those presented here. That was a tort action brought against the union and its officials to recover damages which the plaintiff alleged he had sustained by reason of the defendants' unwarranted interference with his employment in his trade as a hatter. His declaration contained averments similar to those found in the declaration filed by the plaintiff in the case before us. In affirming the judgment recovered in the trial court by the plaintiff, the court said that the defendants took too narrow a view

Eschman v. Huebner et al., 226 Ill. App. 537.

of the plaintiff's right of action when they regarded it as resting merely upon his suspension from the labor union, and that the gist of the action was the damage caused to the plaintiff by an unwarranted interference with him in his employment. The court said that "no doubt plaintiff's membership in the defendant association imports his consent (so far as he had lawful power to give consent) to the discipline of the association, if carried out in good faith and without malice, through the methods prescribed by the laws of the association, and in accordance with the principles of natural justice." The court further pointed out that malice was commonly treated as an essential ingredient of such an action as the one there involved, meaning thereby the intentional doing of a wrongful act without justification or excuse. In that case the court observed that the action taken by the defendants was not in the course of any legitimate competition for the place held by the plaintiff in the factory where he had been employed, but was taken in order to discipline and punish him for an offense of which he was presumably innocent and of which he had not been duly found guilty. It appeared from the evidence that certain members of the defendant union preferred verbal charges against the plaintiff, alleging that he had accepted money from them as a consideration for his assigning them to agreeable work. The rules provided that no member should be put on trial on any charges unless they were submitted in writing. Notwithstanding that rule the verbal charges were referred to the proper committee, a number of hearings were had, and the plaintiff was fined and was directed to give up his position in the hat factory, where he was employed, for one year. He refused to pay the fine and declined to give up his position, whereupon, he lost his union card and as a consequence his position. Later the charges were reduced to writing and the plaintiff was notified of a hearing to be held by the

committee. He declined to attend, on the ground that he could not properly appear until his card was restored to him and, further, that members of the committee had made statements showing that they were prejudiced against him. At a meeting of the union, held subsequently, a motion that he be exonerated was carried, and his card was returned to him and he went back to work. The court held that this situation presented the question of whether the acts of the defendants including the unwarranted conviction of the plaintiff by the committee, their sentence that he should pay a fine and give up his position as foreman, for one year, the ratification of that action by the union and the withdrawal of his union card, with the natural result intended by the defendants that he would be discharged as foreman and thereby be prevented from gaining a livelihood for himself and family, constituted an actionable injury, and the court held that it did.

*Campbell v. Johnson,* 167 Fed. 102, was an action against the members of the Seattle Typographical Union No. 202, the plaintiff also being a member of that union. The plaintiff alleged that the defendants had unlawfully entered into a conspiracy to suspend him from the union and thereby deprive him of his membership and prevent him from following his usual occupation, and earning a living; and that they had unlawfully suspended him, as a result of which he was discharged as night foreman on the Seattle Daily Times. The defendants filed an answer setting up that their union was affiliated with the International Union and was governed by their rules which provided that a member who had been declared guilty of contempt, either of the union or a committee thereof, might be fined, reprimanded or suspended by a two-thirds vote of the union; that the rules provided for certain appeals from such action; that the plaintiff had been charged by a certain committee of the

union with contempt of the committee; that upon a consideration of these charges at a meeting of the union, the plaintiff was declared guilty and suspended for thirty days, by a majority vote. It appeared from the evidence that certain members of the union had learned that matters occurring at their meetings, which were supposed to be confidential, were reaching the offices of the Seattle Daily Times, and a committee was appointed to investigate the matter. The committee met and called in the members of the union who were employed in the Times office, all of whom came in and answered the questions put to them, except the plaintiff, who refused to answer, upon the ground that his answers might tend to incriminate him. The plaintiff did not attend the next meeting of the union, although he knew the committee would then report his attitude. The committee did submit a report, and a motion was made that the plaintiff be declared in contempt of the committee. The presiding officer at that meeting of the union ruled that under the laws of the union it was not necessary to give the plaintiff a trial on the question of his alleged contempt, although the point was made by someone present that the plaintiff could not be found guilty of anything of which he was not directly charged, and that he ought to have a trial. The motion declaring the plaintiff in contempt was duly carried and two days later he was notified of his suspension, notice of which was forwarded to the managing office of the Daily Times. The plaintiff was thereupon suspended from his position and replaced by another and his employers advised him that he must win his appeal within two weeks or be discharged. The plaintiff did appeal and his appeal was sustained but not until after the expiration of the two weeks and in the meantime he lost his position permanently. In affirming a judgment in favor of the plaintiff the court observed that: "It may be assumed that in all associations of a similar

character (to the one there involved) provision is made for the suspension or dismissal of members. The fact that the members had that power, and that provision was made for appeal, does not affect the question of their liability in case of a conspiracy such as was alleged in the complaint. * * * The members of the union undoubtedly had the right to suspend the defendant in error, but that is not to say that they had the right to conspire together to suspend him unlawfully. * * * There was evidence of strong personal feeling against the defendant in error on the part of many members of the union. He had twice before been fined by the union on account of alleged breaches of its rules and on each occasion he had appealed to the International Typographical Union, and his appeal had been sustained. At one of the meetings one of the plaintiffs in error had stated that he was after the defendant in error's scalp, and he was roundly applauded. Other members had said: 'We will get him yet.' 'We will have his card,' and made other expressions of their ill will toward him. There was evidence that his refusal to testify before the committee, for which he was charged with contempt, was not contempt, and that, according to the rules of the union, he could not be required to testify against himself. It is not denied that he was furnished no copy of the charges on which he was finally suspended, and that he had no notice to appear and was not present at the meeting at which he was suspended. There was evidence that the officers of the union refused to allow him an appeal, and refused to show him the record on which he had been suspended, and that he was compelled to take his appeal by telegraphing his own affidavit to the president of the International Typographical Union. It sufficiently appears, also, that he was discharged from his position on account of his troubles with the union and his suspension therefrom, and the hostile attitude of the members of the union.''

Eschman v. Huebner et al., 226 Ill. App. 537.

Counsel for the defendant apparently seek to distinguish the case last cited from the case at bar by pointing out that in the case cited there are many evidences of the malicious hostility of the defendants toward the plaintiff, whereas in the case at bar there is no evidence of any such hostility, but, rather, the evidence shows that the defendants, in everything they did, proceeded according to the rules and constitution of the union, giving the plaintiff ample notice of the various hearings and so on. As already stated, the record in the case at bar does contain evidence, submitted on behalf of the plaintiff, tending to show that the defendants entertained a malicious intent to "get" the plaintiff and thus eliminate his opposition to them.

The defendants further contend that there is no evidence in the record justifying any inference that any concerted action took place between them. In an action such as this, the gist of the action is not the conspiracy but the tort committed and the resultant damage. *Hyman v. Burmeister,* 216 Ill. App. 98, and cases there cited. There is evidence in the record from which the jury might properly come to the conclusion that each of the defendants went out to "get" the plaintiff and that as a result of the course adopted by each of them, he did suffer the damage complained of.

It is further contended that the trial court erred in modifying an instruction to the jury, and complaint is also made of remarks by counsel for the plaintiff in the course of the trial. In our opinion, there was no error in the modification of the instruction complained of, nor is the point involving the alleged misconduct of the plaintiff's counsel tenable.

For the reasons stated the judgment of the circuit court is affirmed.

*Affirmed.*

TAYLOR and O'CONNOR, JJ., concur.